PETER HARRIS, executor, plaintiff in error, vs. THEODORE
TISEREAU et al., defendants in error.

1. When a bill in equity was filed, charging that R. died, leaving a will
   duly executed, and bequeathing his whole estate to his wife for life,
   with remainder to the complainants; that after his death the wife had
   suppressed and destroyed the will, and taken and used the property as
   her own; that she was now dead, but before her death had confessed
   the spoliation of the will; that, at her death, she had left a will ap-
   pointing the defendant her executor, who now had possession of the
   property. The bill further charged that the witnesses to the original
   will of R. were all dead, and that the complainant could not set out a
   copy of the will, and prayed that the executor of the wife might be de-
   creed to hold the property in trust for the complainants:
   Held, that there was equity in the bill; that it did not seek the probate
   of the will, but to attach a trust to and secure the property, and that
   sufficient reasons were given why they had not proven the will before
   the ordinary.
2. A court of equity in this state has jurisdiction over all cases of fraud,
   except fraud in the execution of a will, and this jurisdiction includes
   fraud in the destruction of a will, notwithstanding the exclusive juris-
   diction of the ordinary in general, over probate and intestate matters.
3. As the bill in this case charges that the will was duly executed, the
   demurrer is to be considered as admitting such due execution, and the
   question as to the amount and nature of the proof necessary to make
   out the case, (the will being lost and the witnesses thereto dead,) does
   not at present arise for consideration.

Equity. Wills. Probate. Jurisdiction. Fraud. Before
Judge HERSCHEL V. JOHNSON. Bibb Superior Court. April
Adjourned Term, 1873.

Theodore Tisereau, Amanda, his wife, and Samuel B. Pea-
cock, filed their bill against Peter Harris, as executor of Jane
Rogers, deceased, in which they alleged as follows:

That Berry Rogers died in April, 1866, without issue, leav-
ing surviving him his wife, Jane Rogers, and that said Amanda
Tisereau and Samuel B. Peacock were children of his sister, and
his next of kin by consanguinity; that he left a large estate,
consisting of lands, money, etc., which he had owned in his
own right; that a short time before his death he, being of
sound and disposing mind, executed, in due form of law, a

legal and valid will, of which a copy could not be attached for reasons hereinafter stated; that from their information and belief, such will, after the introductory or formal part, contained, in substance, the following items, limitations and bequests:

*Item*—I give to my wife, Jane Rogers, a life estate in all my property, both real and personal. This provision to be in lieu of dower.

*Item*—It is my will and desire that at the death of my said wife my negro property shall go to and belong to ...... Small, to whom I have already given $...... with which to buy a plantation.

*Item*—To my friend, Peter Harris, I give the sum of $2,500 00.

*Item*—I give and bequeath to my nephew, Samuel B. Peacock, and to my niece, Amanda M. Tisereau, formerly Amanda M. Peacock, the children of my deceased sister, Mary Peacock, all the remainder of my property, both real and personal, of whatever it may consist, subject to the life estate of my said wife. At the death of my said wife the whole of said property shall be equally divided between my said nephew, Samuel B. Peacock, and my said niece, Amanda M. Tisereau, share and share alike.

That they were informed and believed that such will was duly signed by said Berry Rogers, in presence of three competent witnesses, who signed the same as such in presence of said testator and of each other, such witnesses being, to the best of their information and belief, F. W. Brantley, A. F. Sherwood, and Daniel Clark, all of whom died prior to the death of said Jane Rogers; that they were advised and believed, and so stated, that said Berry Rogers had said will in his house at the time of his death, and said Jane Rogers, knowing of and having access to it, at once, upon his death, stealthily took possession of and destroyed it; that in this she was aided and assisted by certain of her own blood relations, who were present and cognizant of the existence and contents of the will, who acted in order to secure to themselves

Harris vs. Tisereau et al.

a benefit from the estate; that said Mrs. Rogers, urged on by their influence, was actuated not only by a desire to defraud complainants, but also by the hope of enlarging her life estate into a fee under the pretended intestacy of her said husband, and would thus be enabled to dispose of the estate according to her own will and pleasure; that in pursuance of such scheme she took possession of the whole estate as in her own right, and undertook to dispose of the same by her own will, making her own relations by consanguinity and strangers in blood to said Berry, the beneficiaries thereunder; that during the whole time said Jane Rogers observed the most profound silence and practiced the most deceptive conduct in reference to the will of said Berry, until a short time before her death, when, in a moment of contrition, she disclosed the fact of the destruction of such will under the influence of her relations; that by reason of such destruction, the secrecy observed, the death of the witnesses to the will of said Berry, and their recent knowledge of the facts, they were unable to make out such a copy of the will as a court of ordinary could set up and establish; that the fraudulent conduct of said Jane Rogers constituted her a trustee for them, and charged her with the custody of the property for their use and benefit; that Jane Rogers died on the ... day of April, 1871, and that thereupon the defendant, the executor nominated in her will, after qualifying thereunder, took possession of the estate, and was receiving rents of the yearly value of $10,000 00; that he had paid out large sums to strangers in blood of said Berry Rogers, and that he was proceeding to dispose of and distribute the whole estate, and had advertised all the property for sale, as executor, under the provisions of her will.

The bill further charged various acts of waste and mismanagement of the executor, not material to the issue before this court; that he was a man of but small means, and was incapable of successfully taking charge of the estate; that complainants were without adequate remedy at law, but could only have such relief in a court of equity.

The prayer was for an injunction against said defendant's

selling or exercising control over said property; for the appointment of a receiver to take charge of the property; for a decree that the estate in the hands of said defendant, as executor, which had been so held by Jane Rogers in trust for complainants, under the will of Berry Rogers, might be turned over to complainants to be divided between them, and for general relief.

The defendant demurred to the bill. The demurrer was overruled, and defendant excepted.

WHITTLE & GUSTIN; R. F. LYON, for plaintiff in error.

1st. There is no equity in the bill. Complainants allege that they cannot make out such a copy of the will as can be admitted to probate and record, and they cannot claim under the will, unless it is such an one as can be so admitted to probate and record. The real object of the bill is to set up the will without legal proof, and this cannot be allowed. Equity follows the law: Code, section 3083; Carter *vs.* Jordan, 15 Ga., 76.

2d. The Code provides how a will lost or destroyed subsequent to the death of the testator shall be established, and there are no exceptions to the law requiring this: Code, section 2431; Kitchens *vs.* Kitchens, 39 Ga., 168.

3d. The court of equity had no jurisdiction of the subject matter of the bill, and such want of jurisdiction appeared upon the face of the bill. By the Code, section 331, courts of ordinary have original, *exclusive* and general jurisdiction of the probate of wills, and of all such other matters and things as appertain or relate to estates of deceased persons, and section 2421 also gives the court of ordinary *exclusive* jurisdiction as to probate of wills. Even before this exclusive jurisdiction was conferred upon the courts of ordinary the jurisdiction of the courts of equity in matters of this kind was doubted: Perkins *vs.* Perkins, and Walton *vs.* Walton, 21 Ga., 13; Slade *vs.* Street, 27 *Ibid.*, 17.

4th. The tendency of the judicial decisions had been, before the Code, to treat the court of ordinary as a court of ex-

Harris vs. Tisereau *et al.*

clusive jurisdiction as to matters within its jurisdiction, and the act expressly conferring such exclusive jurisdiction seems to have been passed in compliance with the suggestions of the courts, as to what that court ought to be: Tucker vs. Harris, 13 Ga., 1; Perkins vs. Attaway, 14 *Ibid.*, 27; Davis vs. Mc-Daniel, 47 *Ibid.*, 195.

POE & HALL; C. B. WOOTEN, for defendants.

1st. In England chancery has jurisdiction over the suppression and spoliation of wills: 2 Roberts on Wills, 49; 1 Mad. Ch., 325; 3 Atkyns, 359; 2 Vern., 380, 561; 1 P. Wms, 731; 8 Hump. 390.

2d. All equity jurisdiction in Georgia is vested in the superior court: Code, sections 3080, 3100; 6 Paige R., 46; 1 Story's Eq., 252; 21 Ga. R., 17.

3d. Presumption against spoliation: 1 Greenl. Ev., secs. 31, 568.

McCAY, Judge.

1. The question whether, in any case, a court of chancery in this state can entertain jurisdiction of the probate of a will, is a new one, and deserves serious consideration, though it is not, in our judgment, necessarily involved in the record. It is contended that the language of the constitution of 1868 takes away this jurisdiction, if it ever existed. The argument insisted on is as follows: The constitution of 1798 declares that the superior court "shall have concurrent jurisdiction in all other civil cases:" Constitution 1798, article 3d, section 1. In section 6, of the same article, the powers of a court of ordinary, or register of probates, are in general terms conferred on "the justices of the inferior court." The constitution of 1861, after giving certain exclusive jurisdiction to the superior court, among which is exclusive jurisdiction in equity cases, gives concurrent jurisdiction to that court in all other civil cases. In another section probate jurisdiction is given to the ordinary, and an appeal allowed to the superior court: Constitution 1861, article 4, section 2, paragraphs

5 and 9, and section 3, paragraph 5. The constitution of 1868, after providing for certain exclusive jurisdiction, including equity cases in the superior court, gives the superior court jurisdiction in all other civil cases, "except as hereinafter provided:" Article 4, section 2, paragraphs 5 and 9. Thereafter, to-wit, in section 3, of article 4, the powers of a court of ordinary are given to the ordinary, with an appeal to the superior court. The argument is, that by providing an appeal from the ordinary to the superior court, and by confering jurisdiction on the ordinary of probate cases, after the words "except as hereinafter provided," it is meant to be declared that the jurisdiction of the ordinary is declared to be positively exclusive, so that under no circumstances can the superior court have jurisdiction, except by appeal, of any probate of a will. It is admitted that previously to 1861, the constitution was at least open, as this court intimated in *Slade vs. Street*, 27 *Georgia*, 17, to such a construction as gave the superior court such jurisdiction, as a court of equity, as the court of chancery had in England. But it is said that under the constitution of 1868, especially taking into account section 331 of the Code, which in terms declares the probate jurisdiction to be exclusive in the ordinary, even the jurisdiction which was formerly in the superior court, as a court of equity, is taken away. But we think the words, except as hereinafter provided, mean no such thing as this. Were there no positive denial of jurisdiction, thereafter, perhaps the words would bear the meaning put upon them, but the constitution of 1868 positively denied jurisdiction to the superior court over certain debts and over the homestead. These words, "except," etc., it will be noticed, are added to the clause giving jurisdiction to justice courts, and to the clause conferring equity powers upon the superior court, and are evidently qualifications upon the jurisdiction of all courts, in view of the positive denial of jurisdiction contained in the homestead and relief clauses referred to. It seems to us that this is the most natural meaning to put upon these words under the circumstances, and that to construe them as referring to the provis-

Harris *vs.* Tisereau *et al.*

ion made afterwards, for a probate court, is strained and unnatural.

2. But the jurisdiction of the ordinary over the probate of wills, appointing administrators and executors, and generally of matters pertaining to intestate and testate estates, is, and always has been in this state, exclusive.   This is the positive provision of the Code, section 331, and has been the constant practice and ruling of the courts from time immemorial.  But what is meant by the exclusive jurisdiction of the ordinary in such cases?   Does it mean any moret han is meant by exclusive jurisdiction in the superior court to try titles to land, or in the inferior court to lay out or close up roads, or exclusive jurisdiction in land courts to decide a question of head-rights?   If a case arise involving any of these questions, in which there is also fraud, accident or mistake, or any of those complications which call for the interference of equity, jurisdiction arises in a court of equity, notwithstanding the exclusive jurisdiction of the other courts.   A court of equity is "for the protection and relief of parties where, from any peculiar circumstances, the operation of the general rules of law would be deficient in protecting from anticipated wrong or relieving for injuries done:" Code, 3081.   And if a case arise presenting those features which authorize equitable interference, the fact that some other court has ordinarily exclusive jurisdiction of the principal subject matter, is no hindrance to the equitable jurisdiction.   A court of equity will, under proper circumstances, grant a new trial from a verdict at law, or before any court: Code, 3129.   And our Code, as to questions of fraud, broadly declares that equity has concurrent jurisdiction with courts of law in all cases of fraud, except fraud in the *execution* of a will : Code, sec. 3172.   These provisions of our Code are but a succinct statement of the chancery jurisdiction in England.   Its fundamental idea is, that it undertakes to supply the lack of other courts in granting relief, where a right sufficiently perfect for redress by courts, is either not recognized by other courts, or by reason of their defective machinery cannot be fully protected and

administered: Haynes' Outlines of Equity, 23, 27; Law Library, volume 98. There was under the old system of England no mode by which a will of real estate could be probated and recorded once for all. It was considered a muniment of title, and was required to be proven, and might be attacked whenever it was offered in evidence before a court. The probate court, if the will was a will of personalty as well as of realty, might probate it. But the probate was not noticed by the common law courts. This was a serious defect in English jurisprudence; and to remedy this, the courts of chancery in England will entertain a bill to *establish* a will of realty in favor of the devisee against the heir. The court does this under its jurisdiction to quiet titles and perpetuate testimony. But that is almost a probate, since, if it be established against the heir, the judgment binds his heirs and privies: Loveless on Wills, 416, 417; 1 Madd. Chan., 253; Boise vs. Bosborough, 52 E. Chan. R., 817, where the subject is fully discussed.

As to wills of personal property, this defect in the English system did not exist, and there was no call for chancery to remedy it. Probate of a will of personalty against the world, and once for all, was made in the ecclesiastical court. It was of the utmost importance to society that this should be done. The death of the owner of personal estate devoted his personalty of every description to his debts, his legatees and distributees. It was, therefore, necessary that it should forthwith appear whether his personal property should be distributed or go to legatees, and that his debts should be paid before it went to either. Some mode, therefore, of settling once for all whether there was a will, was a necessity of society. This, for certain reasons which are part of the history of England, fell to the ecclesiastical courts, and was performed in all its details by those courts under rules as wide and as little cramped by common law narrowness as were the proceedings of equity courts. That there was a will, or that there was not, was inquired into, its precise terms were ascertained, it was spread upon a book for the registry of wills, and the court

undertook the superintendence of its execution. In the doing of this it exercised powers and followed methods unknown to the common law, derived from the same source, the civil law, as the powers and methods of the court of chancery. It established lost, mutilated or destroyed wills; it set aside its own judgments, and allowed rehearings and reviews for good cause, and examined questions of fraud, accident and mistake as keenly and searchingly as did a court of chancery. Under such a system even the broad jurisdiction of chancery over fraud might well be considered unnecessary in matters within the scope of the powers of the probate court. And long since it has been settled that fraud in the procurement of a will is not within the jurisdiction of a court of equity. Whether there be or be not fraud is one of the issues settled by the probate. If there be fraud, it is no will. If the will be set up, the judgment settles the matter. And if the application to chancery be before judgment, the reply is that the ecclesiastical court is competent to settle it. And though at one time equity would interfere to redress fraud in the *probate* as it would fraud in a common law trial, by acting personally on the parties and compelling them to go into the probate court and do rightly, yet, in England that jurisdiction has rarely been exercised, and may now be said to be abandoned, the power of the probate court to grant new trial, to search the conscience of the parties and to punish for contempt, being ample and complete : See the cases collected and the subject discussed in Perry on Trusts, section 182. But both in this country and in England this limitation of the jurisdiction of chancery over frauds has not extended so far as to deny the jurisdiction where a will has been *fraudulently destroyed.* In Tucker *vs.* Phipps, 3 Atk., 363, Lord HARDWICK asserts the jurisdiction in the very broadest terms. The case goes upon the general jurisdiction of equity over frauds, and recognizes the right of the legatee to come into equity against the spoliator, to enforce against him the bequest as a trust. A distinction is taken between the general probate of the will which properly pertains to the ecclesiastical court, and enforcing the

title or right of the legatee, and the chancellor says, that as against the spoliator, the court would not put the legatee to the hardship of establishing the words of the will against the world by probate before the ecclesiastical court. And so far as I can find there is no decision of a case in England contrary to this. In Dalston *vs.* Coatsworth, 1 P. Wlliams, 731, ·which was for relief against the fraudulent suppression of a deed, two cases are cited by the chancellor where the court decreed the spoliator of a will to hold the bequest in trust for the legatee, though there was no probate of the will; and in Haynes *vs.* Haynes, 2 Vernon, 441, the same question was made and decided.

In this country there is a conflict in the decisions. In Ohio, 15 Ohio, 345, it is held that the will must first be set up in the probate court. And this would seem to be the rule in Louisiana: Gaines *vs.* Chew, 2 Howard, 619, and Gaines *vs.* Hener, 24 Howard, 553. Perhaps also in Massachusetts: 12 Allen, 1. But in Bailey *vs.* Styles, 1 Greenleaf's Chancery Reports, (N. J.) 220; in Allison *vs.* Allison, 7 Dana, (Kentucky,) 90; in 1 Bay, (S. C.) 464; Meade *vs.* Langdon, (22 Vermont,) 59, and in Buchanan *vs.* Mastock, 8 Humphries, (Tennessee,) 390, the doctrine of Lord HARDWICK, in Tucker *vs.* Phipps, is fully recognized and acted on. Our own court, in *Slade vs. Street*, 27 *Georgia*, 17, whilst this particular question was not the point of the case, distinctly recognize the same doctrine; and is there not great significance in the broad language of the Code, section 3172, that equity has concurrent jurisdiction with all other courts in questions of fraud, except fraud in *the execution* of a will. It cannot be doubted but that if a will be duly made and executed, and the testator die, leaving it as his will, and it be fraudulently suppressed, that some court has power to correct the wrong. If the probate court has the power, and in certain cases it clearly has, section 2431, Code, then the express words of section 3272 gives chancery concurrent jurisdiction.

In the case made by this bill, to-wit: one where a will duly executed has been destroyed after the testator's death

and the witnesses are all dead, we have doubts if the probate court has, in this state, jurisdiction. Section 2931 of the Code implies that the probate court can only set up a lost or destroyed will if the witnesses be living. Unless this is to be taken as a repeal of the well settled rule that such a will may be set up on proper proof, then chancery alone has jurisdiction. In England, it is clear that a will duly executed and destroyed after the death of the testator, may be set up, though all the witnesses be dead, if clear proof be made that such a will did in fact exist: 1 Haggard, 115 ; 2 Lee, 22 ; 1 Adams, 462 ; and this is the general ruling in the courts of this country. See the doctrine discussed in 2 Redfield on Wills, 6, 11.

The statutes providing for the due execution of wills, while they provide in detail how they shall be signed and attested, make no provision as to how they shall be proven to have been so signed and attested. And the courts have adopted the rules of evidence usually enforced to prove facts in the courts. If the subscribing witnesses be within the power of the court they must be called. If they be dead, insane, or out of the jurisdiction, the next best evidence is the resort to proof of handwriting. If the will be lost, the witnesses must be produced, if accessible; if not, the next best evidence is to be used. It is not meant by this rule that anything but *evidence* is to be used. And there are many cases where the courts have refused the probate because the proof has not come up to the rule, which is well settled that the proof in such cases must be clear and satisfactory : See a discussion of the whole subject with the cases: 1 Redfield on Wills, 348, 349. Such being the general rules of law, we do not think that section 2431 of the Code was intended to deprive any court of the right to set up a lost will where the witnesses are dead, but only the court of ordinary, and it does that only by implication. Cases may be presented where the proof would be so clear as that it would be shocking to refuse redress, and where it would be not only a temptation to crime but a premium upon it to refuse.

3. As this case comes before us at present, the due execution of the will and its destruction by the only heir, the defendant's intestate, is admitted, and our present decision is only that on the demurrer there is equity in the bill. Whether the facts charged are proven, may arise when the case is tried. We only say now that the law requires a satisfactory case to be made out. Whether that is done must depend always on the facts of each case.

Judgment affirmed.